IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK, AS SUBROGEE OF
GALATI YACHT SALES,

    Plaintiff,

vs.                                       CASE NO. 5:05cv175-RS-AK

MILLER MARINE YACHT SERVICES, INC.,

    Defendant.
_____/

## ORDER

    Before the Court is Defendant's Motion for Summary Judgment (Doc. 21) and the Plaintiff's Response (Doc. 29). The Motion for Summary Judgment is denied.

I. Facts

    The Defendant, Miller Marine Yacht Service, Inc., (Miller) builds, maintains, and services boats. Plaintiff, Great American Insurance Company of New York, is the subrogee of Galati Yacht Sales (Galati), a yacht dealership that does business throughout the state of Florida. Galati has a program known as "Single Point Make Ready" (SPMR), the purpose of which is to have virtually all its new vessels rigged and launched by a third party. Galati and Miller agreed to establish a SPMR location on Miller's premises. "In accordance with customary practice and dealings between the parties,"  Miller agreed to lease yard space to Galati for its SPMR facility, to rig the vessels, to launch Galati vessels, and to provide Galati with labor. Galati also had two of its own employees, Larry Imhoff and Brian Bodner, working at the Miller SPSM location. There was no written agreement which set out the parties' duties, responsibilities, and authority in carrying out the rigging and launching of the Galati boats.

1

This litigation arises due to damage caused to a Galati vessel, a 59 foot Carver, delivered to its SPMR at Miller. Both parties agree that the damage to the vessel was caused by the incomplete installation of the starboard rudder on the vessel prior to launching it, and they also agree that the chain of events leading to the vessel sinking in its slip are is as follows: The rigging of the vessel in question included the installation of the vessel's rudders. A Miller employee, Terry Chauncey, was told to install the rudders. Chauncey finished installing the port rudder by himself and left the rudder with the keyway and collar locked in. Next, with the assistance of Brian Bodner, Chauncey positioned the starboard rudder so that he could complete the fastening of the rudder assembly. Chauncey went inside the vessel to align the shaft and then placed the lock collar on the starboard rudder, but did not tighten it down. The tiller arm was on the shaft, but the keyway had not been installed. Since the rudder installation took place towards the end of the day, Chauncey did not have time to complete the installation of the starboard rudder that day.

Chauncey claims that he told Bodner he would need another hour the following day to finish installing the starboard rudder. Bodner denies that this part of the conversation took place. Chauncey called in sick the following day, and continued to remain out of work for several weeks. In the interim, Bodner gave Jerry Penna, another Miller employee, the authorization to place the vessel into the water. No one from Miller or Galati inspected the rudders to ensure that they were properly installed prior to placing the vessel in the water. After the vessel was launched, it was tied up in the slip. The rigging of the vessel continued throughout that day while the vessel was in its slip. After the boat yard closed for the day, Mike Miller, the owner of Miller Marine, did a routine check of the yard. He discovered that the dive platform on the vessel was under water. Mike Miller immediately called his employees back to the yard to raise the vessel. Subsequently, it was determined that the cause of the sinking was that the starboard rudder had fallen out, allowing water to enter the vessel at that point.

## II.  DISCUSSION

**A. The Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank

3

& Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

**B.  The Substantive Law**

Miller moves for summary judgment on the following grounds: 1) The case does not meet the jurisdictional requirements for an admiralty or maritime case; 2) The sinking of the vessel was not caused by negligence on the part of Miller Marine, but rather caused by negligence on the part of Galati; and 3) Miller Marine did not breach the warranty of workmanlike performance. Each issue will be addressed in turn.

1. Jurisdiction

Miller contends that this case is not subject to admiralty jurisdiction because no maritime contract or maritime tort was involved. Great American contends that the Court's jurisdiction is not based on the existence of a maritime contract, but rather,

because of the existence of a maritime tort. The issue of jurisdiction is intertwined with the remaining issues because "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." East River Steamship Corp., v. Transamerica Delaval, Inc., 476 U.S. 858, 864, 106 S.Ct. 2295, 2298-99, 90 L.Ed.2d 865 (1986). Due to substantive differences between federal common law and Florida law, the determination of the subject matter jurisdiction in this case (if any) will have significant repercussions for the rest of the case.

District courts are granted original jurisdiction, exclusive of the courts of the states, of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333 (1). Since Miller does not dispute the fact that the boat was a "vessel" as defined by 1 U.S.C. § 3, the Supreme Court's two prong test must be satisfied for the claim to be cognizable in admiralty: 1) The location of the tort must occur on navigable waters (locality test) and 2) There must be a nexus between the tort in question and traditional maritime activity (nexus test). Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995). Miller contends that neither prong is satisfied in this case, while Great American argues that both requirements have been met.

     a. Location Test

The alleged tort must have occurred on navigable water for it to cognizable in admiralty. Miller argues that the "wrong" (i.e. the incomplete installation of the starboard rudder) occurred on dry land and therefore it cannot be a maritime tort. Great American responds that the "law is clear that the negligent act need not occur on water so long as th accident resulting from the negligent act occurs on water." (Plaintiff's Response to Defendant's Motion for Summary Judgment, 7).[1]

---

[1] In a motion for summary judgment, all factual inferences must be viewed in a light most favorable to the non-movant. Since neither party has submitted any information about the body of water in which the vessel was launched, it will be assumed, for purposes of this motion, that the vessel was launched in navigable waters.

Great American cites to two cases, Mink v. Gnemar Industries, 29 F.3d 1543 (11th Cir. 1994) and Wilson v. Suzuki of Orange Park, Inc., WL 3372839 (M.D. Fla. 2005), in support its argument. In Mink, the court discussed whether federal admiralty law applies to a situation where a passenger sailing on a pleasure craft in navigable waters is injured due to the failure of the manufacturer to include handrails on the craft. The court found that such a scenario satisfied the locality and nexus tests despite the fact that the alleged design defect occurred on land. Mink, 29 F.3d at 1546. According to the court, "[b]oth logic and precedent compel rejection of the [plaintiff's] argument. The defect could not have manifested itself, and the injury could not have occurred until the vessel was actually operated as a vessel in navigation. Thus, logically, the tort is a maritime tort." Id. In Wilson, the plaintiff alleged that he had crashed his Sea Doo after the steering malfunctioned due to negligent installation and/or maintenance by the jet ski repair shop. The court, citing to the Mink decision, held that the location test was met because the "plaintiff in this case could not have been injured by the alleged negligence of defendant until operating the Sea Doo on water..." Wilson, WL 3372839 at *2.

In support of his contention that the location test has not been met, Miller cites to the Supreme Court's decision in Executive Jet Aviation, Inc., v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), without any explanation or elaboration. In Executive Jet, tort claims arose from an airplane that crashed into a flock of birds just after takeoff on a domestic flight and fell into the navigable waters of Lake Erie. The Court, in holding that the claim was not cognizable in admiralty, wrote that "a purely mechanical application of the locality test" was not always "sensible" or "consonant with the purposes of maritime law." Id. at 261, 93 S.Ct. at 501. Thus, the Executive Jet Court distanced itself from the traditional admiralty rule focusing on locality alone. The 11th Circuit has reiterated Executive Jet's holding that under "the locality test, the tort occurs 'where the alleged negligence took effect,' rather than where the negligent act was done." Harville v. Johns-Manville Products Corp., 731 F.2d 775, 782 (11th Cir. 1984) quoting Executive Jet, 409 U.S. at 266, 93 S.Ct. at 504. Clearly, in this case, while the initial "wrong" occurred on dry land, it took effect on navigable waters and as such, the locality test is satisfied. In addition, the locality test is met because the defect could not

6

have manifested itself on land and the "injury" could not have occurred until the vessel was operated.

### b. Nexus Test

"The connection test raises two issues. A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce,'" and second "...[d]etermine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995)(internal cites omitted); Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919 (11th Cir. 2001).

In addressing whether there was a potentially disruptive impact on maritime commerce, the focus is on "whether 'the general features' of [this] incident were 'likely to disrupt commercial activity.'" Id. at 538, 115 S.Ct. at 1051. A fair and "intermediate" generalization of the features in this case is as follows: the sinking of a vessel (in a slip) on navigable waters due to an improperly installed part. Having described the general features of the incident, the focus must be on the "potential effect" for disruption of maritime commerce as a result of such a tort, not the "particular facts of the incident." While this particular incident did not actually have a disruptive impact upon maritime commerce, it certainly could have had such an impact. For example, a sunken vessel in navigable waters might become a hidden danger to a vessel in maritime commerce, or provide an impediment to the timely movement of commercial vessels into and out of the area. In addition, improperly installed equipment could conceivably malfunction or dislodge during the launching of the vessel, thus disabling the vessel and creating a danger to all marine vessels in the vicinity of the disabled vessel, including those vessels involved in maritime commerce. Thus, the general features of this incident are likely to have a potentially disruptive impact on maritime commerce.

The next issue is whether the "general character of the activity giving rise to the

incident shows a substantial relationship to traditional maritime activity."[2] Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. at 539, 115 S.Ct. at 1051. In making this determination, "[w]e ask whether a tortfeaser's activity, commercial or non-commercial, on navigable waters is so closely related to activity traditionally suspect to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." Id. at 539-40, 115 S.Ct. at 1051. Miller cites to cases that support the view that "there is no nexus to traditional maritime activity in the construction of a new vessel." Lowe v. Ingall's Shipbuilding, 723 F.2d 1173 (5th Cir. 1984); See also Drake v. Raymark Industries, 772 F.2d 1007 (1st Cir. 1985). These cases are inapposite to the facts of this case. In Lowe, the primary issue was whether a shipyard employer could establish an independent claim for indemnity against an asbestos manufacturer. Before reaching this issue, the court *sua sponte* determined that subject matter jurisdiction was lacking because "[i]t has long been held that ... ship construction is [not] a maritime activity" even if the incomplete vessel is lying in navigable waters. Lowe, 723 F.2d at 1185. In a case with a similar factual background, the 11th Circuit held that "[a]dmiralty jurisdiction does not extend to damage claims such as these by land-based ship repair or construction workers for employment-related, asbestos-induced disease." Harville v. Johns-Manville Products Corp., 731 F.2d 775, 781 (11th Cir. 1984). The holdings in Harville and Lowe are limited to the specific factual scenarios in those cases. This view is buttressed by the holding in Bunge Corp., in which the claim was held to be cognizable in admiralty:

> The relevant activity in the instant case was the construction of Hull No. 40 and the mooring of Hull No. 40 on the navigable waterway of Four Mile Creek. Therefore, we must determine whether the construction and mooring of Hull No. 40 on Four

---

[2] The former Fifth Circuit in Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.1973) used a four prong test to determine whether an activity bears a substantial relationship to a traditional activity. However, both the 11th Circuit and the Supreme Court have recognized that such an approach is permissive and not mandatory. See e.g. Penton v. Pompano Construction Co., Inc., 976 F.2d 636 (11th Cir. 1992). The Court finds that its approach is sufficient for this case.

> Mile Creek had "a substantial relationship to traditional maritime activity." Certainly, some case law suggests that a vessel under construction may not be subject to admiralty jurisdiction. Such cases, however, have little effect on the present case because they involve jurisdiction based in contract, whereas this case involves jurisdiction based in tort. Although a pre-nexus case, the Supreme Court in <u>Tucker v. Alexandroff</u>, 183 U.S. 424, 438-39, 22 S.Ct. 195, 46 L.Ed. 264 (1901), addressed whether a vessel under construction may be subject to admiralty jurisdiction. In essence, the Court held that a vessel in its stocks could not be made liable in admiralty, either in rem or in personam. The Court did state, however, that "[i]n the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction."

<u>Bunge</u>, 240 F.3d at 924-925. The <u>Tucker</u> Court continued by stating that "[w]e have had frequent occasion to notice the distinction between a vessel before and after she is launched. So sharply is the line drawn between a vessel upon the stocks and a vessel in the water, that the former can never be made liable in admiralty... while if in taking the water during the process of launching, she escapes from the control of those about her, shoots across the stream and injures another vessel, she is liable to a suit in rem for damages." <u>Tucker</u> at 438-39, 22 S.Ct at 201. Therefore, the launching of the vessel in this case satisfies the nexus to traditional maritime activity.

There is also support for this conclusion from the following passage in <u>Grubart</u>:

> "Likewise, in [<u>Foremost Insurance Co. v. Richardson,</u> 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300], we said that "[b]ecause the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction...." By using the word "involves," we made it clear that we need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will "involve" such traditional maritime activity and will meet the second nexus prong... That result would be true to [our] requirement of a "substantial relationship" between the "activity giving rise to the incident" and traditional maritime activity... The substantial relationship test is satisfied when at least one

9

>   alleged tortfeasor was engaging in activity substantially related
>   to traditional maritime activity and such activity is claimed to
>   have been a proximate cause of the incident."

Id. at 541(internal cites omitted).

One of the arguable proximate causes of the injury to the vessel was the launching of it, an activity that has a traditional relationship with maritime activity. See also, Reel Therapy Charters, Inc. v. Marina Management, 2004 A.M.C. 378 (N.D. Fla. 2003). Based on Supreme Court and 11th Circuit precedents, and satisfaction of the location and nexus tests, it is likely that admiralty jurisdiction is present.[3] See e.g. Mink v. Gnemar Industries, 29 F.3d 1543 (11th Cir. 1994); Sea Lion v. Reyes, 23 F.3d 345 (11th Cir. 1994).

　　2. Negligence

Miller claims that the sinking of the vessel was caused by intervening negligence of Gallati. The Court finds that there are several material facts in dispute that preclude the determination of this issue at this stage. They include: 1) what, if anything Chauncey actually told Bodner regarding the incomplete installation of the rudder, along with any other pertinent matters discussed during that conversation; 2) whether Galati or Miller was ultimately responsible for insuring that the rudders were properly installed prior to launching; 3) what role Galati's supervisors play at Miller's SPMR; 4) whether anyone at Miller assured Galati personnel that the rudders were properly installed; 5) whether the Carver and Galati checklists should have been completed by Galati personnel prior to the ship's launch. The experts hired by both parties disagree on several material issues as well. The fact that there is no written agreement between the parties makes their disagreements about certain facts even more difficult to resolve than they otherwise would have been at this stage.

It is worth mentioning Great American's contention that prior to the

---

[3] This order does not now hold that the claim is cognizable in admiralty, and further evidence must be submitted to prove that the vessel sank in navigable waters.

commencement of this lawsuit, Mike Miller sent a letter to Galati explaining Miller Marine's position on allocating fault for the damage to the vessel. In the letter, Miller stated that Galati had "assumed full responsibility for the supervision of the personnel provided by Miller Marine," and that "Galti has assumed full responsibility for the supervision of the personnel provided by Miller Marine."  (Plaintiff's Response to Defendant's Motion for Summary Judgment, Exhibit B.) As a result, Miller did not "believe that the full responsibility of for damages to [the vessel] is [Miller Marine's] alone." Id. Great American, on behalf of Galati, has not admitted any fault in this matter. While the contents of Mike Miller's letter may prove valuable to Great America, it simply buttresses the point that there are several material facts in dispute.

3. Warranty of Workmanlike Performance

This issue cannot be determined at this stage because, as has been discussed, there are several material facts in dispute.

Accordingly,

1. The Defendant's Motion for Summary Judgment (Doc. 21) is denied.
2. The parties shall submit evidence to the Court at the Pre-Trial Conference on June 27, 2006 on the issue of whether the vessel was launched in navigable waters.

**ORDERED** on June 26, 2006.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**