IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK, AS SUBROGEE OF
GALATI YACHT SALES,

    Plaintiff,

vs.                                             Case no. 5:05cv175-RS-AK

MILLER MARINE YACHT SERVICES, INC.,

    Defendant.
_____/

## ORDER

Before the Court are the Plaintiff's Trial Memorandum on the Economic Loss Rule (Doc. 45) and the Defendant's Brief Regarding Applicability of the Economic Loss Rule (Doc. 47).

### I. Facts

The facts of this case have already been set out in the Court's Order on Summary Judgment (Doc. 39). A brief summary of the relevant facts follows: Defendant Miller Marine Yacht Services, Inc. (Miller) builds, maintains, and services boats. Plaintiff Great American Insurance Company of New York (Great American) is the subrogee of Galati Yacht Sales (Galati). Galati has a program known as "Single Point Make Ready" (SPMR), the purpose of which is to have virtually all its new vessels rigged and launched by a third party. Galati and Miller agreed to establish a SPMR location on Miller's premises. "In accordance with customary practice and dealings between the parties," Miller agreed to lease yard space to Galati for its SPMR facility, to rig the vessels, to launch Galati vessels, and to provide Galati with labor. Galati also had two of its own employees working at the Miller SPSM location. There was no written agreement which set out the parties' duties, responsibilities, and authority in carrying out the rigging and launching of the Galati boats.

This litigation arises due to damage caused to a Galati vessel, a 59 foot Carver, delivered to its SPMR at Miller. Both parties agree that the damage to the vessel was caused by the incomplete installation of the starboard rudder on the vessel prior to launching it. No one from Miller or Galati inspected the rudders to ensure that they were properly installed prior to placing the vessel in the water. After the vessel was launched, it was tied up in the slip. The rigging of the vessel continued throughout that day while the vessel was in its slip. After the boat yard closed for the day, Mike Miller, the owner of Miller Marine, did a routine check of the yard. He discovered that the dive platform on the vessel was under water. Mike Miller immediately called his employees back to the yard to raise the vessel. Subsequently, it was determined that the starboard rudder had fallen out, allowing water to enter the vessel at that point, and resulting in the vessel sinking. Great American's Complaint makes claims against Miller grounded in contract and tort. The only question presented by the parties' motions is whether the economic loss rule (ELR), as interpreted by federal admiralty law, precludes Great American's tort claim. If the Court determines that the ELR applies, Great American's tort claim would not be cognizable in admiralty, and it would have to amend its Complaint to show that the Court has subject matter jurisdiction on other grounds (e.g. diversity).[1]

## II. Economic Loss Rule

Though seemingly a straightforward inquiry, "[t]he economic loss rule has become a confusing morass. As more than one court has lamented, the rule has been stated with ease but applied with great difficulty.'" Indemnity Ins. Co. of North America v. American Aviation, Inc., 891 So.2d 532 (Fla. 2004)(Canterro J., concurring)(internal cites omitted); See also, Grams v. Milk Products, Inc., 283 Wis.2d 511, 699 N.W.2d 167 (Wis. 2005) (Abrahamson, C.J., dissenting)("[T]he most quickly and confoundingly expanding legal doctrine is ... the economic loss rule. Like the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic The Blob, the

---

[1] Great American has alleged in its Response to Miller's Motion for Summary Judgment that this Court has jurisdiction based on diversity (Doc. 29). The Court finds that this mechanism is insufficient and should the ELR preclude their tort claim, Great American will need to file an amended complaint.

economic loss doctrine seems to be a swelling globule on the legal landscape of this state")(internal cites and quotes omitted). The purpose of the economic loss rule has been described by the Florida Supreme Court as follows: "the law of contracts protects one's economic losses, whereas the law of torts protects society's interest in being free from harm. Finding no reason to burden society as a whole with the losses of one who has failed to bargain for adequate contractual remedies we concluded that 'contract principles [are] more appropriate than tort principles for recovering economic loss without an accompanying physical injury or property damage.'" Airport Rent-A-Car, Inc. v. Prevost Car, Inc., 660 So.2d 628, 630 (Fla. 1995)(internal cites omitted); See also, 6 Bruner & O'Connor Construction Law § 19.10 ("..the doctrine of economic loss is intended to serve as a firewall between tort and contract by barring recovery as tort damages of economic losses caused by unintentional tortious performance of legal or contractual obligations"). The ELR "in its most widely accepted form, bars the use of negligence or strict liability theories for recovery of economic losses arising out of commercial transactions where the loss is not the consequence of an event causing personal injury or damage to other property." 6 Bruner & O'Connor Construction Law § 19.10; See also, 86 Corpus Juris Secundam Torts § 26 (The economic loss rule "bars recovery in tort when a party suffers economic loss unaccompanied by personal injury or property damage.")

### III. Supreme Court Precedent

Federal case law applying the ELR in the context of federal admiralty law is limited due to the Erie doctrine and its requirement that federal courts apply state law in diversity cases. See e.g. Saratoga Fishing Company v. J.M. Martinac & Company, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997)(Scalia, J., dissenting) ("But unlike state courts, we have little first-hand experience in the development of new common-law rules of tort and contract governing commercial transactions"). The Supreme Court, however, has published two decisions in the last twenty years that address the economic loss rule. In the first decision, East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Court held that an admiralty tort plaintiff could not recover for the physical damage a

defective product caused to the "product itself. " Id. at 871, 106 S.Ct. at 2302 ("a *manufacturer* in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself" (emphasis added)). The East River Court rationalized that "if [products liability remedies] were to progress too far, contract law would drown in a sea of tort," and that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." Id. at 866, 106 S.Ct. at 2300; See also, Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618-19 (3d Cir. 1995) cited in Restatement (Second) of Contracts § 205 (1981). The Court was clear that a plaintiff could recover for physical damage caused to "other property"; it was less definitive in providing general guidance for how to distinguish the "product" from the "other property." See also, Restatement (Third) of Torts: Prod. Liab. §21 (e) (1998): "What constitutes harm to other property rather than harm to the product itself may be difficult to determine."

Subsequently, in Saratoga Fishing Company v. J.M. Martinac & Company, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76, the Court held that the equipment added by a initial user of a vessel prior to selling it to a subsequent buyer was "other property." In this case, the rudder was part of a new boat. Thus, while the specific holding in Saratoga provides little guidance to this case, Saratoga's discussion of East River's holdings is worth reviewing:

> The [East River] Court reasoned that the loss of the value of a product that suffers physical harm-say, a product that destroys itself by exploding-is very much like the loss of the value of a product that does not work properly or does not work at all. In all such cases, the [East River] Court held, "[c]ontract law, and the law of warranty in particular, is well suited" to setting the responsibilities of a seller of a product that fails to perform the function for which it was intended. The commercial buyer and commercial seller can negotiate a contract-a warranty-that will set the terms of compensation for product failure. If the buyer obtains a warranty, he will receive compensation for the product's loss, whether the product explodes or just refuses to start. If the buyer does not obtain a warranty, he will likely receive a lower price in return. Given the availability of warranties, the courts should

>not ask tort law to perform a job that contract law might
>perform better.

Id. at 879-880, 117 S.Ct. at 1786 (internal cites omitted).

The 11th Circuit has not reviewed any decisions interpreting the economic loss rule in the context of federal admiralty law since the East River and Saratoga Supreme Court decisions. Thus, in applying these decisions to the facts in this case, decisions from other circuits, the restatements, and treatises will be consulted. As stated previously, courts have developed exceptions to the ELR, including damage that occurs to "other property." In this case, the ultimate question is whether the vessel *sans* the parts rigged by Miller (including the rudder) is "other property" or whether those parts and the vessel are the same property.

## IV. Application of Federal Admiralty Law

Great American argues that the (ELR) does not apply because 1) "case law - since East River - recognizes that a shipowner has a negligence cause of action against a marine repair facility for negligence [sic] repairs," and 2) "the [ELR] does not preclude a negligence cause of action for damage to 'other property' and "the property that was damaged was not the 'object of the bargain' between the parties." On the other hand, Miller maintains that "East River and its progeny require limiting [Great American] to its contractual remedies."  It is true that courts have approved a negligence cause of action against a marine *repair* facility for negligent repairs. However, this case does not involve the repair of a vessel.

While East River provides an insight into how the Supreme Court views the ELR, its specific holding involved the manufacturer of the product. As the Fifth Circuit held in Employers Insurance v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 761 (5th Cir. 1989), cert. denied, 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989), "the economic loss rule adopted in East River applies specifically to claims against *manufacturers* and that the supervisor and the manufacturer in East River were one and the same. The East River decision does not address whether the economic loss rule in maritime tort applies to contracts for professional services  where the provider of the services is a party other than the manufacturer itself" (emphasis in original). The Suwannee River

court also held that "East River's broad concern for preserving the integrity of contract law in commercial settings applies equally to a case ... where the professional services are an integral part of the manufacture or construction of a product and where the only injury alleged is to the product itself." Id. at 763; see also, Associated Metals and Minerals Corp. v. ALEXANDER'S UNITY MV, 41 F.3d 1007, 1014 (5th Cir. 1995)("The rule of East River Steamship and its progeny applies when the negligent design, professional service, or other process integral to the manufacture or construction of the product results in only injury to the product itself.")  Thus, the crux of the matter involves defining what the "product" is in this case.

Both Great American and Miller cite to the Third Circuit's definition of "other property" in support of their positions. In Sea Land Service v. General Electric, Co., 134 F.3d 149 (3d Cir. 1998), a vessel owner brought a tort claim against General Electric (GE), the manufacturer of the original diesel engine and the replacement connecting rods for that engine after the original engine broke down. As a result of a defective replacement connecting rod, the engine broke down two more times. Sea Land alleged that the connecting rod was defective and claimed profits it lost while the ship was inoperable. In determining whether the ELR precluded Sea Land's tort claim, the Sea Land court looked to the "object of the bargain" - i.e. the "object purchased or bargained for by the plaintiff, in determining whether additions constitute 'other property.'" Id. at 153 quoting Saratoga, 520 U.S at ----, 117 S.Ct. At 1791 (Scalia, J., dissenting). Ultimately, the Third Circuit held that the connecting rod was not separate property (i.e. "other property") from the engine because "every component that was the benefit of the bargain should be integrated into the *product*; consequently, there is no 'other property.'" In addition, the court interpreted East River as precluding the "use of separate contracts as an indicator of separate property for purpose of invoking tort law..." Id. at 154-55.

Great American claims that the "object of the bargain" was not a "complete integrated unit, that is a fully assembled and rigged 59 foot Carver. In other words, Galati did not hire Miller Marine to receive the disassembled vessel and deliver to Galati a fully assembled vessel." Great American argues that "a specific and distinct item of service (or part) - installation of underwater gear - caused damage to the larger unit."

Finally, Great American states that the damages it claims do not even include the cost of reinstalling the underwater gear, and as such, the damages relate to "other property" and the ELR is not applicable. Miller responds by arguing that the "case is contractual in nature" and "case law demonstrates that components that are integrated into the construction of a new vessel are not independent products; rather, the product is the vessel itself." Miller cites to several cases that invoke the so-called "integrated product rule" (e.g. Shipco 2295, Inc., v. Avondale Shipyards, Inc., 825 F.2d 925 (5th Cir. 1987)). Miller states that "the nature of the parties' contract was not for a single component part, but for final assembly of the vessel in preparation for her launch. As such, the vessel is considered the product, not 'other property.'"

Both parties have cited to several cases in support of their respective argument, some of which merit further discussion. The facts in this case are distinguishable from all of the cases cited by the parties. For example, Saratoga was resolved based on the fact that equipment was added by an entity other than the manufacturer and after the vessel was sold to a buyer. See also, Nicor Supply Ships Associates v. General Motors Corp., 876 F.2d 501 (5th Cir. 1989)(holding that a ship charterer who adds seismic equipment to the ship may recover for its loss in a fire caused by a defective engine). In Princess Cruises v. General Electric Company, 950 F.Supp. 151 (E.D. Va. 1996), the parties contracted for the routine inspection and repair of an existing ship. This case involves a contract to install specific parts of the vessel (among other things), not the entire vessel. As Great American points out, Miller was not supposed to assemble the entire vessel, just the underwater gear. The facts in Shipco are more difficult to reconcile. In Shipco, the parties entered into one overall contract for the design and construction of the ship. In defining what the product was in the case, the Shipco court reasoned:

> The completed vessels were obviously the objects of the contract. Shipco did not bargain separately for individual components of each vessel. We are persuaded that those same vessels that were the object of the contract must be considered "the product" rather than the individual components that make up the vessels.

Shipco, 825 F.2d at 928. In addition, as with most construction projects, there were subcontractors involved, including AEG, who designed what turned out to be defective steering equipment. The Shipco court did not feel that it was appropriate for the buyer to have more rights against the subcontractor than the final manufacturer - and this makes sense because any other conclusion would tread upon the Supreme Court's cautionary instruction concerning the intrusion of tort law upon legal ground traditionally occupied by contract law. In this case, it has never been alleged by either party that Miller was a subcontractor. Miller was an independent contractor hired by Galati, not by Carver (the manufacturer) to perform a specific service. Also, while Miller claims that "[i]t is the rudder's integration into the vessel, not the person who installs it, that is determinative of the issue of 'other property," it does not provide any case law in support of this contention.

The facts of this case do not fit neatly into the integrated product rule as applied in Shipco because it was the installation that was allegedly "defective," not the part. A year after Shipco, the Third Circuit further commented that "it is the character of the plaintiff's loss that determines the nature of the available remedies." King v. Hilton-Davis, 855 F.2d 1047, 1051 (3d Cir.1988) (applying Pennsylvania law)(also holding that " [w]hen loss of the benefit of a bargain is the plaintiff's sole loss, ... the undesirable consequences of affording a tort remedy in addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims").  Finally, in Ice Fern Shipping Co., Ltd. v. Golten Serv. Co., 2005 A.M.C. 1043 (S.D.N.Y. 2005), the parties contracted to fix a specific part (i.e. the governor). The failure of the governor caused damage to the engine of the ship. The district court distinguished the case from Sea Land holding that "because only the governor was covered under the terms of the contract, and the failure of the governor caused damages to the Vessel's engine, Plaintiffs may recover for such damages under a negligence theory." The facts in this case fall in between Ice Fern and Shipco - the agreement between the parties covered more than just one part, but fell short of covering the entire ship. Thus, while all of these cases provide insight into the application of the ELR by federal courts, they do not address the specific facts in this case.

V. Conclusion

Ultimately, the Court will look to the underlying reasons behind the ELR in resolving this issue. According to the 11th Circuit, "the rationale underlying the economic loss rule is that parties should protect against the risk of economic loss during contract negotiations through warranty provisions and price adjustments rather than attempt to recover under tort law after the loss occurs." Pulte Home Corp. v. Osmose Wood Preserving, Inc., 60 F.3d 734, 739-40 (11th Cir. 1995)(applying Florida law). The Court finds that both parties were knowledgeable, commercial entities who should have negotiated a contract that allocated the "economic risks of nonperformance through the bargaining process," which obviously would have included compensation for improper installation of the rudder and the damages resulting to the vessel. Indemnity Ins. Co. of North America v. American Aviation, Inc., 891 So.2d 532, 536 (Fla. 2004). The following statement from the Florida Supreme Court is persuasive and summarizes this Court's findings regarding the issue:

> A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made. Thus, when the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties have, or could have, addressed through their contractual agreement.

Id.; See also, Jones v. Childers, 18 F.3d 899, 904 (11th Cir. 1994)(applying Florida law)(holding that the ELR "proceeds from the theory that courts must preserve well-defined conceptual and practical distinctions between the body of law relating to contract damages and tort damages, so that contracting parties may rely confidently on their allocation of risk without fear that their counterparts will seek to recoup contract damages through tort actions"). For these reasons, the Court finds that the economic loss rule is applicable to the facts in this case.

VI. Jurisdiction Based on Maritime Contract

The Court finds that Great American's claim cannot be brought in admiralty as a maritime contract. Benedict indicates that "even after the vessel is launched, while she is not sufficiently advanced to discharge the functions for which she is designed, the materials, work and labor for her completion are not the subject matter of admiralty jurisdiction. The contract is treated as one merely preliminary to the use of the ship as an instrument of commerce and navigation." Benedict on Admiralty at § 186. Several cases support this proposition including Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 243, 41 S.Ct. 65, 66, 65 L.Ed. 245 (1920)(holding that a contract to work on a vessel "not sufficiently advanced to discharge the functions for which intended" or not in a "condition to function as intended" was not maritime in nature) and Hatteras of Lauderdale, Inc. v. Gemini Lady, 853 F.2d 848 (11th Cir. 1988). In Hatteras, the court reaffirmed the holding in Thames Towboat: "Until a vessel is *completed* and launched it does not become a ship in the legal sense, and therefore admiralty jurisdiction does not exist" (emphasis added). Hatteras, 853 F. 2d at 850.

Accordingly,

1. The economic loss rule applies. Therefore, Count II of the Complaint is dismissed with prejudice.

2. The Court does not have admiralty jurisdiction on the basis of a maritime contract.

3. Great American may file an Amended Complaint alleging non-admiralty federal jurisdiction no later than Thursday, July 27, 2006 at 4:30 PM CDT.

4. Because Miller will be entitled to a trial by jury if non-admiralty federal jurisdiction is invoked, the trial is continued pending further order. The parties may, however, stipulate to non-admiralty federal jurisdiction and to trial by the Court. In that event, trial will remain scheduled for July 27, 2006.

**ORDERED** on July 20, 2006.

              **/s/ Richard Smoak**
              **RICHARD SMOAK**
              **UNITED STATES DISTRICT JUDGE**